UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHRISTOPHER CELONA, | ) | |
| PRUDENCE CELONA, and | ) | |
| PAUL CELONA, | ) | |
| Plaintiffs | ) | |
| vs. | ) | |
| | ) | CA. No. 4:15-cv-40147-TSH |
| NEIL ERICKSON, In his official | ) | |
| capacity as Police Chief | ) | |
| JAMES F. TRIFIRO, In his individual | ) | |
| capacity as a police officer | ) | |
| RUSS ST. PIERRE, In his individual | ) | |
| Capacity as a police officer | ) | |
| Defendants | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The Defendants herein oppose the Plaintiffs' Motion for Summary Judgment on all

Counts of the Amended Complaint on the following grounds:

## I. CONCISE STATEMENT OF MATERIAL FACTS OF RECORD PURSUANT TO RULE 56.1

*Christopher Celona's Class A LTC Renewal Denial*

Christopher Celona ("Christopher") first applied for his Class A- License to Carry ("LTC")

with the Gardner Police Department on or about October 8, 2008. *See Copy of Christopher*

*Celona's 2008 Class A- LTC Application*, attached hereto as **Exhibit K,** marked as Exhibit 1 to

*Christopher Celona's Deposition.* The 2008 application contained the following questions:

> 7. In any state or federal jurisdiction have you ever been convicted as an
> adult or adjudicated a youthful offender or delinquent child for the
> commission of . . . (e) a violation of any laws regulating the use,
> possession or sale of controlled substances as defined in Section 1 of
> MGL 94C?
>
> …
>
> 10. Have you ever appeared in Court as a defendant for any criminal
> offense (excluding non-criminal traffic offenses)?

*See Exhibit K*. Christopher answered "no" to both questions. *See id.* Sometime in 2015, Christopher re-applied for his Class A LTC. *See Deposition Transcript of Christopher Celona, Plaintiffs' Exhibit D, at pgs. 22, 25.* On his renewal application, Christopher represented that he had not previously been convicted for possession of controlled substances and that he had never appeared in Court for any criminal offense. *See Narrative of Sergeant James F. Trifiro, Ref.: 15-659-OF, Plaintiffs' Exhibit B; Exhibit D, at pgs. 24 - 25 (stating, "Probably, yeah" when asked at his deposition if he answered "no" on his renewal application to prior criminal record questions).*

The LTC application process involves a review by various administration agencies, including by the Firearms Records Bureau ("FRB"), and is completed online, through the Massachusetts Instant Record Check System. *See Affidavit of Sergeant James F. Trifiro, at ¶4, attached hereto as Exhibit L.*

On or about January 29, 2015, as part of the review process, the FRB flagged a 1991 drug conviction against Christopher in New Hampshire. *See Exhibit L, at ¶5, and attached MIRCS details.* At the FRB's request, Sergeant Trifiro reviewed the charge and conviction information with both the Keene, New Hampshire and the Milford, New Hampshire Police Departments. *See Exhibit L, at ¶6; Plaintiff's Exhibit B.* Based on his investigation, Sergeant Trifiro learned that Christopher was previously convicted of misdemeanor possession of a "318-B: 2"controlled substance, which, in New Hampshire, refers to a schedule of substances ranging from heroin to marijuana. *See Exhibit L, at ¶7; Plaintiff's Exhibit B.* Sergeant Trifiro communicated his findings to the FRB and the FRB confirmed that the 1991 conviction was a statutory disqualifier. *See Exhibit L, at ¶8; Plaintiff's Exhibit B.*

On or about April 6, 2015, Sergeant Trifiro informed Gardner Police Chief Neil Erickson ("Chief Erickson") of his findings. *See **Exhibit L,  at ¶9; Plaintiff's Exhibit B***. Based on this information, Chief Erickson directed Sergeant Trifiro to deny Christopher's application. *See **Exhibit L, at ¶9; Plaintiff's Exhibit B.*** At the time, neither Sergeant Trifiro nor Chief Erickson had knowledge as to the specific nature or amount of the controlled substance Christopher was previously convicted of possessing. *See **Exhibit L,** at **¶10;** Defendant Chief Erickson's Answers to Interrogatories, Answer No. 5, attached hereto as **Exhibit M.***

On April 6, 2015, Chief Erickson drafted a written notice of denial to Christopher, which notice informed him of the basis for the denial, the right to appeal the denial, and his obligation to "turn into the police department . . . without delay, your firearms . . . which you have in your possession." *See **Exhibit M,** Answer to No. 6; Plaintiffs' **Exhibit F***. The April 6, 2015, letter informed Christopher Celona, in bold writing, that the failure to turn over his weapons constituted a criminal offense under the gun licensing statute. *See Plaintiffs' **Exhibit F***.

### The April 7, 2015 Alleged Search and Seizure

On or about April 7, 2015, Sergeant Russell St. Pierre ("Sergeant St. Pierre") traveled to 201 Otter River Road, Gardner, MA to deliver Chief Erickson's denial letter. *See Affidavit of Sergeant Russell St. Pierre, at ¶3, attached hereto as **Exhibit N.*** When he arrived at the residence, he was informed that Christopher was not at home and thus left a message for him to call the station. *See **Exhibit N, at ¶4.*** Later that afternoon, Sergeant St. Pierre received notice via dispatch that Christopher had called and was at home. *See **Exhibit N, at ¶5.*** At approximately 4:30 PM, Sergeant St. Pierre returned to 201 Otter River Road to deliver the notice. *See Exhibit N, at ¶6; Plaintiff's **Exhibit D,** at pg. 28*

Sergeant St. Pierre and Christopher met in Christopher's driveway. *See **Exhibit N, ¶7.*** While speaking in the driveway, Sergeant St. Pierre gave Christopher the denial letter and informed him that he would need to turn over the guns in his possession. *See **Exhibit** N, ¶7-8; Plaintiff's Exhibit D, at pgs. 28-29 (admitting written denial provided and that he "must have" read the denial notice).* According to Sergeant St. Pierre, Christopher did not ask to see a warrant. *See **Exhibit** N, ¶9.* Sergeant St. Pierre recalled that Christopher Celona agreed to turn over his guns. *See **Exhibit** N, ¶8; **Plaintiffs' Exhibit G** ("Celona was polite and compliant").* At his deposition, Christopher admitted that he agreed to turn them over. *See **Plaintiffs' Exhibit D** at pg. 31: 3-8 ("I told him **I would be glad to give him** the five weapons, but he's not to take any other ones because they didn't belong to me.").* Christopher testified that he did object, however, to turning over the guns owned by his wife and father. *See **Plaintiffs' Exhibit D**, at pg. 31: 3-8.  But see, Plaintiff's **Exhibit G** (noting that Christopher's statement regarding the gun owned by Prudence did not occur until they were in the basement, upon opening the locker, no reference to father's guns other than to state some of the guns were "heirlooms" of the family).*

According to Sergeant St. Pierre, Christopher walked him directly to the basement bulkhead, opened the door, and showed him the guns which were locked in safes. *See **Exhibit** N, at ¶10.* Sergeant St. Pierre entered the basement with Christopher's permission and proceeded directly to the safes, which were visible from the doorway. *See **Exhibit N**, at ¶10.* Christopher then opened the safes with his keys. *See **Exhibit N**, at ¶11.* A total of twenty-seven guns were stored in the basement. *See **Plaintiffs' Exhibit H** (identifying twenty-seven guns, all marked as owned by Christopher Celona as of April 7, 2015).*

Sergeant St. Pierre attests in his Affidavit that he asked Christopher if he was able to identify which of the twenty-seven guns belonged to his wife. *See **Exhibit N**, at ¶12.* According

to Sergeant St. Pierre, Christopher could not specifically identify it. *See **Exhibit N**, at ¶12; Plaintiff's **Exhibit G** ("While examining the guns, he was unable to say which guns belonged to [his wife].").*  Indeed, he did not know how many guns were in the safes. *See Plaintiff's **Exhibit G** ("The firearms were counted twice as Celona did not know the total number of weapons that he had in his possession.").*

Based on the number of un-identifiable guns in the lockers, Sergeant St. Pierre informed Christopher that all of the guns would need to be taken back to the station unless his wife could assist with the identification in person. *See **Exhibit N**, at ¶14.* Christopher did not know when his wife would be home to assist. *See **Exhibit N**, at ¶14.*  Due to Christopher's inability to identify which of the twenty-seven guns were <u>not</u> his, all of the guns were taken back to the station for identification and safe-keeping. *See **Exhibit N**, ¶15.  See also, Plaintiff's **Exhibit H**, (marking all guns as held for safe-keeping).* Sergeant St. Pierre has further attested that, had Christopher at any time objected to surrendering the guns or asked to see a warrant, he would have called for back-up, posted a watch, and sought a warrant as necessary. *See **Exhibit N**, at ¶16.* A receipt was provided for the guns' retrieval. *See Plaintiffs' **Exhibit G** (noting receipt provided); Plaintiff's **Exhibit D**, at pg. 37: 20-22.*

Although Christopher claims he possessed (and consented to turn over) only five guns on April 7, 2015, *see Plaintiffs' **Exhibit D**, at pg. 31,* he also testified that his father was "letting [him] hold onto" his guns, which accounted for majority of the remaining guns in the safes.  *See Plaintiff's Exhibit D, at pgs. 35-37 (admitting that father did not expect to get the guns back; stating that he was  holding the guns despite fact that his father had a "legit" gun safe). See also, Plaintiffs' **Exhibit J**, at pg. 14 (noting "heirloom" guns were stored at 201 Otter River Road as a bequest to her son by Paul Celona).*

*The April Transfers and Retrievals*

On or about April 9, 2015, Christopher, his wife, Prudence Celona ("Prudence"), and Christopher's father, Paul Celona ("Paul"), met with Sergeant Trifiro in the lobby of the Gardner Police Department. *See Exhibit L, at ¶11.* Five of the twenty-seven guns were identified at the time as owned by Christopher; the remainder was marked as in his possession. *See Plaintiffs' Exhibit B, at pg. 2.* Sergeant Trifiro informed the Celonas of the process for transferring surrendered guns to a holder of a valid LTC via the Massachusetts Gun Transaction Portal on the FRB's webpage. *See id. See also, Plaintiffs' Exhibit D, at pg. 41: 6-18.*

During their meeting, Prudence informed Sergeant Trifiro that one of the guns, a Colt .45 Pistol, was hers and she asked to retrieve it. *See Exhibit L, at ¶12.* According to Sergeant Trifiro, he offered her the option of waiting in the lobby until an evidence officer was available. *See Exhibit L, at ¶12.* Sergeant Trifiro also offered Prudence Celona the option of retrieving her Pistol along with the remaining transferred guns all on one day. *See Exhibit L, at ¶13.* Prudence chose not to wait. *See Exhibit L, at ¶14.*

The next day, on April 10, 2015, two of the twenty-seven guns were identified as belonging to Paul, one was identified as belonging to Prudence, five were identified as belonging to Christopher, one belonged to an individual by the name of Alan Patz (a former colleague of Christopher's), one belonged to Anthony Celona (Christopher's brother), and seventeen did not have any confirmed owner. *See Plaintiffs' Exhibit B, at pg. 2; Plaintiffs' Exhibit D, at pgs. 45-46 (stating that Alan Patz sold him the shotgun and that he was "holding" his brother's gun for him for "shooting" purposes).*

Sergeant Trifiro confirmed on two separate occasions with the FRB that that the proper procedure for transferring surrendered guns to a valid LTC holder is through the Massachusetts

Gun Transaction Portal. *See Exhibit L, at ¶15.* On or about April 24, 2015, Prudence's and Paul's guns were released to them. *See Copies of Signed Receipts, attached hereto as Exhibit O.* After they transferred the remaining guns through the Portal to Paul Celona, all of the guns were released. *See Plaintiffs' Exhibit D, at pg. 48 (acknowledging transfer of Christopher's guns to Paul through the portal and stating "we got them all" in response to inquiry regarding retrieval  status).*

Christopher Celona did not appeal the denial of his renewal application for his Class A LTC. *Exhibit L, at ¶16.* On November 7, 2015, he re-filed a renewal application. *See Copy of Renewal Application, attached hereto as Exhibit P, marked as Exhibit 6 to Plaintiff Christopher Celona's Deposition.* In December 2015, his renewal application was granted. *See Plaintiffs' Exhibit D, at pgs. 54: 20 – 55:3.*

## II.    ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll* v. *Xerox Corp.*, 294 F. 3d 231, 236 (1st Cir. 2002); Fed. R. Civ. P. 56 (a). The court must consider the evidence submitted in support of the motion in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. *See Navarro v. Pfizer Corp.,* 261 F.3d 90, 94 (1st Cir.2001).

A party seeking summary judgment must first identify the absence of any genuine dispute of material fact. *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 323 (1986). A material fact "is one 'that might affect the outcome of the suit under the governing law.'" *United States v. One Parcel of*

*Real Prop. with Bldgs.,* 960 F.2d 200, 204 (1st Cir.1992) (quoting *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248 (1986)). If the moving party satisfies this burden, the burden shifts to

the nonmoving party to "produce evidence on which a reasonable finder of fact, under the

appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence,

the motion must be granted." *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 94 (1st

Cir.1996); *see Celotox,* 477 U.S. at 323.

### B.  Count I: Injunctive Relief and 42 U.S.C §1983 as against Chief Erickson

#### i.       Injunctive Relief for April 6, 2015 Denial of LTC Renewal Application

In Count I of the Amended Complaint, Christopher Celona alleges that Chief Erickson

deprived him of his Second Amendment rights by denying his Class A LTC renewal application

on April 6, 2015. *See Amended Complaint, Count I.* Count I is framed as a request for

"declaratory and injunctive relief" and 42 U.S.C §1983 monetary damages. *See id.* A claim for

injunctive relief is not ripe unless it survives a fitness for review and hardship analysis. *See*

*Ernst & Young Depositors Econ Prot. Corp*., 45 F. 3d 530, 534 (1st Cir. 1995). "Fitness

involves the question of whether the claim involves uncertain contingent events that may not

occur as anticipated or may not occur at all. The hallmark of cognizable hardship is direct or

immediate harm." *Wesson* v. *Town of Salisbury*, 13 F. Supp. 3d 171, 177 (D. Mass. 2014),

*citing* 45 F. 3d at 536; *Mass. Ass'n of Afro-Am. Police, Inc.* v.  *Boston Police Dep't*, 973 F.2d

18, 20 (1st Cir. 1992) (*per curiam*).

To the extent Christopher Celona seeks an order from this Court enjoining Chief

Erickson from "refusing to renew his LTC due to his conviction for marijuana possession," the

claim either (1) fails the two-prong analysis or (2) the order requested would be void for

mootness. *Pineiro* v. *Gemme*, 937 F. Supp. 2d 161, 170 (D. Mass. 2013) (claim for injunctive or

declaratory relief would have been rendered moot by repeal of internal police department policy and re-issuance of plaintiff's LTC absent plaintiff's voluntary dismissal).

There is no dispute that on November 7, 2015, Christopher Celona re-applied for his Class A LTC.  Christopher Celona admits that his November 2015 renewal application was approved approximately a month thereafter. A claim becomes moot when "intervening events make it impossible to grant the prevailing party effective relief." *Pine Tree Medical Assocs. v. Secretary of HHS,* 127 F.3d 118, 121 (1st Cir.1997) (citing *Burlington N. R.R. Co. v. Surface Transp. Bd.,* 75 F.3d 685, 688 (D.C.Cir.1996)). Here, Christopher Celona continues to press his claim for declaratory relief and has, in fact, moved for summary judgment. "Because federal courts lack jurisdiction to decide moot cases," *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70 (1983), the Court cannot, as a matter of law, provide the relief the Plaintiff is requesting. Alternatively, because there is no contingency in play and no remaining cognizable hardship (i.e.: the renewal application has already been granted), an injunction would be improper under the circumstances. Summary judgment as to Count I should be denied insofar as Christopher Celona seeks equitable relief with respect to the application denial.

ii.     **Monetary Damages under 42 U.S.C §§1983**

As for the claim for monetary damages, summary judgment in favor of Christopher Celona would be improper because the claim is barred as to Chief Erickson pursuant to the qualified immunity doctrine. *Sheppard* v. *Aloisi*, 384 F. Supp. 2d 478, 490 (D. Mass. 2005).

"Qualified immunity shields government officials performing discretionary functions from liability for civil damages when their conduct does not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known'." *Id.* (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In order to find in favor of a defendant on the grounds

of qualified immunity, the defendant must prove that there is no basis on which the plaintiff will establish: (1) that a constitutional right was violated; (2) the right was clearly established at the time of the alleged conduct; and (3) a reasonable official would have understood that the challenged conduct violated the established right. *Garnier v. Rodriguez*, 506 F.3d 22, 26-27 (1st Cir. 2007) (citing 42 U.S.C. § 1983).

Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time the action was taken. *Harlow v. Fitzgerald, 457 U.S. 800 (1982).* In order to conclude that the right which the official allegedly violated is "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* Government officers are shielded from liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). If officers of reasonable competence could disagree on the lawfulness of the alleged conduct, immunity should be recognized. *Sheppard v. Aloisi*, 384 F.Supp.2d 478, 490 (D.Mass.2005) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity safeguards even unconstitutional conduct if a reasonable officer at the time and under the circumstances surrounding the action could have viewed it as lawful. *Garnier v. Rodriguez*, 506 F.3d at 27 (1st Cir. 2007). Qualified immunity allows for a wider range of mistakes. *Wilson v. City of Boston*, 421 F.3d 45, 53 (2005) (citing *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir. 2004)). The qualified immunity standard is not a stringent test, and gives

ample room for mistaken judgments by protecting all but the plainly incompetent and those who

knowingly violate the law.  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

General Laws c. 140, §131 gives a licensing authority, here Chief Erickson, discretion to

issue Class A licenses to possess and carry a firearm, for "all lawful purposes," in the city or

town in which the licensee lives or has a place of business "if it appears that the applicant is not

a prohibited person. . . . ."  M.G.L. c. 140, §131 (a), (d) (2014). A "prohibited person," includes

an applicant who:

> (ii) has, in any other state or federal jurisdiction, been convicted or
> adjudicated a youthful offender or delinquent child for the commission of
> . . . . (E) a violation of any law regulating the use, possession or sale of a
> controlled substance as defined in said section 1 of said chapter 94C
> including, but not limited to, a violation of said chapter 94C.

M.G.L. c. 140, §131 (d)(ii)(E)(2014).[1]

Here, Chief Erickson reasonably relied on the express language of M.G.L. c. 140,

§131(d)(ii)(E), the FRB's recommendation that the renewal application be denied, and

information gleaned through Sergeant Trifiro's investigation suggesting that the 1991 New

Hampshire conviction could have been for possession of substances ranging from heroine to

marijuana. *See generally*, *Ruggiero* v. *Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 258-

259 (1984) (a licensing authority has "considerable latitude" in performing its duty of insuring

that irresponsible persons do not have access to deadly weapons).

Notably, although the Plaintiff cites to the cases of *Wesson* v. *Town of Salisbury*, 13 F.

Supp. 3d 171 (D. Mass. 2014) *("Wesson")*, and *Richmond* v. *Peraino*, 128 F. Supp. 3d 415 (D.

Mass. 2015)  ("*Richmond*") for his Second Amendment argument, neither of these cases

---

[1] M.G.L. c. 140, 1 §31(d) was amended on August 13, 2014 to reflect the above-quoted
language through the enactment of St 2014 c. 284, §48.

addressed qualified immunity or the broad discretion afforded to Chiefs of Police as licensing authorities. *See Wesson*, 13 F. Supp. 3d  at 177-178 ("It must first be stated what plaintiffs are *not* seeking … Plaintiffs are not challenging the right of Chiefs of Police to exercise their discretion as licensing authorities. Nor . . . do they challenge the constitutionality of the statutory disqualification of persons convicted of violations of the controlled substances laws from possessing firearms"); *Peraino*, 128 F. Supp. 3d at 420 (same). Indeed, these cases involved as-applied challenges to the constitutionality of Section 131(d) where the applicants sought LTCs for home self-defense. In both cases, the Court ordered tailored, limited relief permitting the respective licensing authorities to place applicable restrictions on the subject licenses as they deemed necessary but precluding the consideration of the plaintiffs' respective out of state marijuana convictions with respect to in-home possession.

Simply put, *Wesson* and *Richmond*'s limited holdings do not address the <u>reasonableness</u> of a licensing authority's denial on the basis of an out of state conviction for possession under a qualified immunity lens. Moreover, unlike the *Wesson* and *Richmond* plaintiffs, Christopher Celona has not mounted an as-applied challenge to the licensing scheme, nor could he reasonably do so, because his stated interest in applying for a Class A LTC renewal was not limited to home self-defense. *See statement on applications noting "all lawful purposes" as the intended use of Class A LTC.*  Additionally, unlike the Plaintiffs in *Richmond* and *Wesson*, at the time of the subject denial, Plaintiff's criminal background check came back with an out-of-state conviction for possession of an unknown substance, which could have been anything from marijuana to heroin. Based on the information available to him at the time, it was reasonable for Chief Erickson to believe that a denial was proper. The Court should <u>deny</u> the Plaintiffs' Motion as to Chief Erickson.

C.  Counts III, IV, VII, VIII, and XI: 42 U.S.C §1983 as against Sergeant St. Pierre

Plaintiffs Christopher Celona, Prudence Celona, and Paul Celona have each brought Fourth Amendment claims as against Sergeant St. Pierre predicated on his warrantless entry of Christopher and Prudence's basement and the taking of the twenty-seven (27) guns.[2] Summary judgment should not enter in the Plaintiffs' favor because Sergeant St. Pierre's actions did not constitute a seizure, the entry and takings were consented-to, and because Sergeant St. Pierre is entitled to qualified immunity. Moreover, a genuine dispute of material fact exists regarding the April 7, 2015 exchanges in the driveway and basement and the scope of consent granted.

i.      There was no "seizure" calling for an exception to the warrant requirement

As an initial matter, unlike in the case of *Pasqualone* v. *Gately*, 422 Mass.398, 401 (1996) to which the Plaintiffs cite in their Memorandum, the April 7, 2015 interaction between Christopher Celona and Sergeant St. Pierre was not a "seizure," calling for exceptions to the warrant requirement. In *Pasqualone*, the defendant appeared at the plaintiff's residence accompanied by four officers, verbally informed him that his license was revoked, and informed the plaintiff he was there to seize his firearms. In considering the warrantless seizure argument, the Massachusetts Supreme Judicial Court ("SJC") stated the following: "Perhaps if Gately had telephoned Pasqualone or even . . . explained under the circumstances he would prefer that Pasqualone turn over the weapons at once, we might have a different case. But this was a demand, not a request, and one accompanied by a considerable show of authority." *Id.* at 401. Here, Sergeant St. Pierre acted in the proper manner and did exactly what the SJC in *Pasqualone* suggested: He personally appeared at the Plaintiff's home unaccompanied by other officers after first leaving a message, he informed Christopher Celona of the circumstances of

[2] Paul Celona does not assert a claim for the search of his son's home.

the denial while standing in the driveway, he provided Christopher Celona with a written notice of the denial, and accurately explained that, under the circumstances, Christopher Celona was required to turn over his weapons.

### ii.      If there was a "seizure," it was pursuant to valid consent.

Even if the Court were to deem the April 7, 2015 interaction a "seizure," it is well-settled that consent is "one of the specifically established exceptions" to warrantless searches and seizures. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219 (1973). Searches and seizures conducted pursuant to valid consent, as a matter of law, are constitutionally permissible. *See id.* *at* 222, citing *Katz* v. *United States*, 389 U.S. 347, 358 (1967). Whether the consent given was valid "turns on an assessment of the totality of circumstances." *U.S.* v. *Barnett*, 989 F. 2d 546, 554 (1993). "Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent." *Id.*  Written consent is not required. *U.S.* v. *Barnett*, 989 F.2d. 546, 555 (1st Cir. 1993). Moreover, it is not essential that the officer first inform the consenting party of the right to withhold consent, though such knowledge is one of the voluntariness factors. *See id.*

Here, viewing the facts in favor of Sergeant St. Pierre, the entry and alleged seizure was with Christopher Celona's valid and voluntary permission. Sergeant St. Pierre met with Christopher Celona in the driveway, explained the circumstances of the denial, and provided him with the denial notice drafted by Chief Erickson. According to Sergeant St. Pierre, Christopher Celona did not, at any point, ask to see a warrant. At all relevant times, he was polite and compliant. Christopher Celona escorted Officer St. Pierre directly to the basement, and Sergeant St. Pierre entered the basement with his permission. The storage lockers were in plain view as they were visible from the doorway, and Christopher Celona opened the lockers

with his keys. This is simply not a case involving coercion or a vulnerable party: At the time, Christopher Celona was forty-two years of age. *See Plaintiffs Exhibit D, at pg. 7 (identifying date of birth)*. He had a GED and no language difficulties. *See id, at pgs. 9-10*. Plaintiff cannot deny that he knew he could object since he testified that he specifically told Sergeant St. Pierre that he "was happy to give" Sergeant St. Pierre his guns, but that he could not allow Sergeant St. Pierre to take guns owned by his wife and father. Moreover, Sergeant St Pierre was alone and without back-up at the time permission was granted. By all accounts, this was a civil, informed, and cordial interaction. *Contrast*, *U.S.* v. *Pena*, 924 F. Supp. 1239, 1251-1252 (1st Cir. 1996) (consent was not deemed voluntary where defendant was a native Spanish-speaker with an eight-grade education, had no criminal record, and was surrounded by armed police, one of which had previously entered his home to conduct an uninvited protective sweep). Indeed, Plaintiff admits to consenting to turning over his guns. To the extent there is a dispute of fact as to which of the twenty-seven guns this valid consent applied to, summary judgment is would be improper.[3]

### iii.    Sergeant St. Pierre is entitled to qualified immunity.

Separate and apart from the permissibility of the April 7, 2015 entry and taking, Sergeant St. Pierre is entitled to qualitied immunity for his actions. At all relevant times, he reasonably understood that he had received unequivocal, verbal consent and thus, he did not need a warrant. At no time did Christopher ask to see a warrant. Had he done so, Sergeant St.

---

[3] If the Court agrees with the Defendants that the search and seizure was consented to as to Christopher Celona, the consent would apply with equal force to Prudence as they were co-inhabitants and because both had joint access to the guns. *See generally*, *Georgia* v. *Randolph*, 547 U.S. 103, 106 (2006) (recognizing third party consent as valid). As to Paul Celona, the record suggests his guns were given to Christopher and Prudence as a bequest to his grandson and that he no longer owned them. Paul Celona has not come forward with any admissible evidence to indicate the guns were his as of April 7, 2015.

Pierre would have posted a watch and obtained a warrant as necessary. Christopher undisputedly consented to turn over his guns, all of the guns were stored together, Christopher had the key to the locker, and he could not identify the gun belonging to Prudence. Because all of the guns were undisputedly in Christopher's possession and because he had given his permission for Sergeant St. Pierre to take his guns <u>before</u> the identification problem arose, a reasonable officer in Sergeant St. Pierre's position would have believed that taking all of the guns to the station for identification was lawful. Clearly, this was neither a knowing violation nor the mark of plain incompetence. *Cf. Hunter v. Bryant*, 502 U.S. at 229.

Moreover, under M.G.L. c. 140, §129D, Christopher Celona was statutorily required to "without delay deliver or surrender" all firearms in his possession to the Gardner Police Department. M.G.L. c. 140, §129D. Under the 2014 amendments to Section 129D, effective at the time of the alleged April 7, 2015 seizure, there is no "safe harbor" for the surrender requirement for appeals from the <u>denial</u> of an LTC application. *See* M.G.L. c. 140, §129D (creating safe harbor during appeal period for individuals whose licenses have been suspended or revoked); *Commonwealth* v. *Ferguson*, 87 Mass. App. Ct., 1132, 2015WL3903372, n. 1 (2015) ("The statute no longer provides a safe harbor during the pendency of an appeal for those . . .whose applications have been denied."). Because Sergeant St Pierre complied with the statutory scheme in place, provided the proper notice, and obtained what he understood to be valid consent, he is entitled to qualified immunity for the April 7, 2015 seizure as alleged. *Contrast*, *Pasqualone*, 422 Mass. at 402 (no reasonable belief that warrantless seizure was lawful where circumstances were far from exigent, seizure was without consent, and no written notice provided; statutory irregularity precluded qualified immunity finding).

At a minimum, there remains a genuine dispute of material fact as to the nature of the April 7, 2015 interaction and the scope of the consent granted. Accordingly, the Court should deny the Plaintiff's summary judgment motion as to Counts III, IV, VII, VIII, and XI.

D.  Counts II, VI, and X: 42 U.S.C §1983 as against Sergeant St. Pierre

The Plaintiffs are also each separately claiming that the alleged April 7, 2015 seizure infringed on their Second Amendment right to keep and bear arms. *See Amended Complaint, Counts II, VI, and X.*[4] Plaintiffs have not cited to a single case wherein it was held that the physical taking of firearms as opposed to the denial, revocation, or suspension, of a license constitutes an infringement of the right to possess and carry under the Second Amendment. Paul Celona and Prudence Celona were not, at any point, deprived of their LTCs. At all relevant times, they maintained their right to possess and carry. As to Christopher Celona, any such alleged infringement would necessarily relate to the denial of his renewal application, not the consented-to taking of the guns in his basement. Indeed, Plaintiffs' property deprivation claims relate to due process, not the Second Amendment. In the event the Court does consider the Plaintiff's unsupported contention that the right to possess and carry is somehow tied to the firearm itself, the Defendant herein re-asserts his consent and qualified immunity arguments as set forth in Section II.C of this Memorandum.

---

[4] Although the Plaintiffs' Memorandum in Support of Motion for Summary Judgment apparently asks the Court to enter a declaratory judgment in the Plaintiffs' favor, *see Plaintiffs' Memorandum at pgs. 9-10,* the Amended Complaint simply asserts a claim for monetary damages for Counts II, VI, and X. While the Prayer for Relief asks the Court to issue a broad-brush declaration that "Chapter 140, §129D does not authorize police to enter homes, search for weapons . . . [and] to seize property," such relief is not warranted based on the facts of this case or the claims asserted in the operative pleading.

E.  Counts V,  IX, and XII: 42 U.S.C §1983 as against Sergeant Trifiro

The Plaintiffs also assert due process claims as against Sergeant Trifiro based on the period

of the time the twenty-seven (27) guns were out of their possession and their required use the

Massachusetts Gun Transaction Portal.[5] As to the Plaintiffs' claims pertaining to the Portal, it is

questionable whether having to log-on to the website and follow electronic prompts amounts to

a deprivation of interest in property.[6] It is difficult to conceive how the affirmative act of using

the Portal amounts to a loss of rights in the guns, particularly when the transfer provision of

M.G.L c. 140, §129D exists for the purpose of safeguarding an individual's rights in guns

surrendered to a Police Department. *See generally*, *Jarvis* v. *Village Gun Shop, Inc*., 805 F. 3d

1, 4-5 (1st Cir. 2015) (discussing statutory scheme and transfer provision).

Assuming, *arguendo* that the Court deems the Plaintiffs to have identified a sufficient

property interest, Sergeant Trifiro is nevertheless entitled to qualified immunity on the basis of

adequate post-deprivation remedies. "Due process is flexible and calls for such procedural

protections as the particular situation demands." *Morrissey* v. *Brewer*, 408 U.S. 471, 481

(1972).  When a complainant alleges violations of procedural due process and asserts that those

---

[5] In the Plaintiffs' Memorandum in Support of Summary Judgment, Christopher Celona also advances the tenuous argument that he was deprived of his statutory right to appeal the denial of his LTC application because no one contacted him before the written notice was issued. Nothing in the licensing scheme suggests a right to a pre-denial hearing, nor has the Plaintiff cited to a case standing for that proposition. Indeed, the First Circuit has previously upheld the constitutionality of Massachusetts' licensing scheme which does not provide for a pre-deprivation hearing as part of the application process. *See Hightower* v. *City of Boston*, 693 F. 3d 61, 84 (2012) ("We reject Hightower's claim that due process was required before her license was revoked."). Furthermore, Christopher Celona was not in any way deprived of his right to file a petition for judicial review in the Gardner District Court pursuant to §131 within 90 days of the April 6, 2015 letter. Had the Plaintiff wished to appeal the denial, he was free to do so.

[6] To the extent the Plaintiffs' contention is with the steps required to effectuate a transfer, the Plaintiffs have sued the wrong parties. None of the named defendants maintain the Portal or have any role in its creation or formatting.

violations are cognizable under section 1983, the existence of state remedies becomes "highly relevant." *Zinermon v. Burch, 494 U.S. 113,* 125 (1990). A reviewing court must therefore examine "the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Id.* at 126. When the deprivation stems from random acts of state employees, post-deprivation common-law remedies satisfy the Fourteenth Amendment's procedural due process requirement. *See Paratt* v. *Taylor*, 451 U.S. 527 (1981) (no due process violation for loss of inmates mailing); *Hudson* v. *Palmer*, 468 U.S. 517 (1984) (extending *Paratt'*s holding to intentional property deprivations). *See also*, *Baker* v. *Gray*, 57 Mass. App. Ct. 618, 625-626 (2003) (seizure of certificate number and plate off of plaintiff's boat did not violate due process under *Parratt-Hudson*; employee entitled to qualified immunity).

Here, Sergeant Trifiro properly informed the Plaintiffs of the Section 129D transfer process and provided Prudence Celona with two options to retrieve her gun: She could either wait in the lobby on April 9, 2015 for an unknown amount of time or they could come back on a different day once all of the guns were transferred. Prudence Celonas selected the second option. Sergeant Trifiro also twice verified with the FRB that the guns identified as being in Christopher Celona's possession had to be transferred through the Portal. As to Paul Celona, the Plaintiffs have not come forward with any evidence to suggest that he objected to waiting for their retrieval post- transfer.

Moreover, to the extent the Prudence Celona and Paul Celona believed Sergeant Triffiro's alleged refusal to return their guns to them without first transferring the remainder was improper, Plaintiffs could have brought an action for conversion or even replevin at common-law for the deprivation of their property. *See Baker* v. *Gray*, 57 Mass. App. Ct. at 625-626.

As to Christopher Celona's due process claims, the First Circuit has previously held that the provisions outlined in M.G.L. c. 140, §129D provides adequate due process notice with respect to the transfer of guns surrendered to a Police Department. *See Jarvis* v. *Village Gun Shop, Inc*., 805 F. 3d at 5, n. 1 ("[I]t is well-settled that such statutory notice is sufficient to put gun owners on notice of the possibility that their guns may be transferred."). Insofar as Christopher Celona's due process claim is that he was entitled to process before his firearms were allegedly seized, the statute itself provides adequate due process protections by way of an appeal. *Cf. Hightower* v. *City of Boston*, 693 F. 3d 61, 86 (noting right to appeal as adequate procedural safeguard against deprivations of property). *See also*, *Zinermon v. Burch, 494 U.S.* at 126; *Amsden* v. *Moran*, 904 F. 2d 748, 753 (1st Cir. 1990) ("Whether the deprivation. . . . was itself erroneous is beside the procedural due process point"). In view of the adequate statutory notice and the post-deprivation remedies available to the Plaintiffs, Sergeant Trifiro "reasonably could believe he was not depriving [them] of property without an opportunity for a hearing or other due process." *Baker* v. *Gray*, 57 Mass. App. Ct. at 626.

The Court should deny the Plaintiffs' summary judgment motion as to Counts V, IX, and XII.

## III.    CONCLUSION

WHEREFORE, for the above-stated reasons, this Honorable Court should deny the Plaintiffs' Motion for Summary Judgment.

DEFENDANTS,
By their attorneys,

/s/ Gerard T. Donnelly
Gerard T. Donnelly, Esquire
BBO # 553283
Courtney E. Mayo, Esquire
BBO # 657790
Margarita I. Warren, Esquire
BBO # 683098
Hassett & Donnelly, P.C.
446 Main Street - 12th Floor
Worcester, MA 01608
Phone:  (508) 791-6287
gdonnelly@hassettanddonnelly.com
cmayo@hassettanddonnelly.com
mwarren@hassettanddonnelly.com

Dated: January 11, 2017

## CERTIFICATE OF SERVICE

I, Gerard T. Donnelly, counsel for the defendants in the above-entitled matter, hereby certify that I have served a copy of the foregoing upon all parties through the Electronic Case Filing system this 11th day of January 2017 to:


J. Steven Foley, Esquire
Law Office of J. Steven Foley
100 Pleasant Street # 100
Worcester, MA 01609
JSteven@attorneyfoley.com

/s/ Gerard T. Donnelly
Gerard T. Donnelly, Esquire