UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER CELONA, <br> PRUDENCE CELONA, and <br> PAUL CELONA, <br>     Plaintiffs <br> vs. <br><br> NEIL ERICKSON, In his official <br> capacity as Police Chief <br> JAMES F. TRIFIRO, In his individual <br> capacity as a police officer <br> RUSS ST. PIERRE, In his individual <br> Capacity as a police officer <br>     Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> )    CA. No. 4:15-cv-40147-TSH <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEFENDANTS' RESPONSES TO PLAINTIFFS CHRISTOPHER CELONA, PRUDENCE CELONA, AND PAUL CELONA'S CONCISE STATEMENT OF MATERIAL FACTS AND ADDITIONAL STATEMENTS OF MATERIAL FACTS PER FED. R. CIV. P. 56 AND LOCAL RULE 56.1

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Disputed as duplicative of Statement No. 5.

7. Undisputed.

8. Disputed insofar as Plaintiff has failed to come forward with evidence that the guns allegedly owned by Paul Celona and stored at 201 Otter River Road were still owned by Paul Celona as opposed to having been gifted, otherwise undisputed. S*ee Plaintiffs' Exhibit D,* at pg. 31, 35-37 (admitting that father did not expect to get the guns back;

*stating that he was holding the guns despite fact that his father had a "legit" gun safe). See also, Plaintiffs' **Exhibit J**, at pg. 14 (noting "heirloom" guns were stored at 201 Otter River Road as a bequest to her son by Paul Celona).*

9. Undisputed.

10. Undisputed that Plaintiff, Christopher Celona, so testified.

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed.

16. Undisputed.

17. Disputed. At the time of the subject LTC denial, neither Sergeant Trifiro nor Chief Erickson had information as to the nature or amount of the substance Christopher Celona was convicted of possessing. The narrative cited to by the Plaintiff does not stand for fact stated. *See Affidavit of Sergeant Trifiro,* **Exhibit L,** *at* ***¶¶7-10;*** *Defendant Chief Erickson's Answers to Interrogatories, Answer No. 5,* **Exhibit M.**

18. Undisputed.

19. Disputed on the basis of credibility. Plaintiff testified that he had previously met with an officer to complete his applications; he had previously filled out three such applications; and he also admitted to misrepresenting on his applications that he had never appeared in Court as a criminal defendant. *See Plaintiffs'* **Exhibit D***, at pgs. 20, 24 - 25 (testifying ot previously meeting with Sergeant Borax to complete the application,, and stating, "Probably, yeah" when asked at his deposition if he answered "no" on his renewal application to prior criminal record questions).*

20. Undisputed.

21. Disputed. At the time of the subject LTC denial, neither Sergeant Trifiro nor Chief Erickson had information as to the nature or amount of the substance Christopher Celona

was convicted of possessing. The narrative cited to by the Plaintiff does not stand for fact stated. *See Affidavit of Sergeant Trifiro,* **Exhibit L,** *at* **¶¶7-10;** *Defendant Chief Erickson's Answers to Interrogatories, Answer No. 5,* **Exhibit M.**

22. Undisputed.

23. Disputed as immaterial for purposes of summary judgment. The First Circuit has previously upheld the constitutionality of Massachusetts' licensing scheme which does not provide for a pre-deprivation hearing as part of the application process. *See Hightower* v. *City of Boston*, 693 F. 3d 61, 84 (2012) ("We reject Hightower's claim that due process was required before her license was revoked.").

24. Undisputed the narrative Officer Trifiro so states but disputed insofar as the plaintiff is attempting to use the term "confiscated" to imply a taking without consent. Sergeant St. Pierre sought Christopher Celona's permission with respect to the surrender of guns in his possession and Christopher Celona unequivocally consented. *See Affidavit of Sergeant St. Pierre,* **Exhibit N,** *¶¶7-9; Plaintiff's Exhibit D, at pgs. 28-29 (admitting written denial provided and that he "must have" read the denial notice; Plaintiffs'* **Exhibit G** *("Celona was polite and compliant").* At his deposition, Christopher admitted that he agreed to turn over his guns. *See Plaintiffs'* **Exhibit D** *at pg. 31: 3-8 ("I told him* **I would be glad to give him** *the . . . weapons").*

25. Disputed for purposes of summary judgment on the seizure issue. Sergeant St. Pierre has averred that Christopher Celona consented to the taking of the guns in his possession and then, after opening the safes, indicated he was unable to identify the gun belonging to Prudence. *See Affidavit of Sergeant St. Pierre,* **Exhibit N ¶¶ 10-15***, Plaintiff's* **Exhibit G** *(noting that Christopher's statement regarding the gun owned by Prudence did not occur until they were in the basement, upon opening the locker, no reference to father's guns other than to state some of the guns were "heirlooms" of the family).*

26. Undisputed Christopher Celona so testified; disputed as to the characterization of the consented-to taking as a "seizure." *See Affidavit of Sergeant St. Pierre,* **Exhibit N ¶¶7-10.**

27. Disputed. The entry was with Christopher Celona's permission. *See Affidavit of Sergeant St. Pierre,* **Exhibit N ¶¶7-10.**

28. Undisputed the narrative so states.

29. Disputed. Sergeant St. Pierre has averred that the alleged entry and taking were pursuant to unequivocal consent. *See Affidavit of Sergeant St. Pierre,* **Exhibit N** *¶¶7-16. See also Plaintiffs'* **Exhibit D** *at pg. 31: 3-8 ("I told him* **I would be glad to give him** *the . . . weapons"). See also, Plaintiff's* **Exhibit G** *(noting that Christopher's statement regarding the gun owned by Prudence did not occur until they were in the basement, upon opening the locker, no reference to father's guns other than to state some of the guns were "heirlooms" of the family).*

30. Undisputed.

31. Undisputed the narrative so states.

32. Undisputed the narrative so states.

33. Undisputed the narrative so states.

34. Undisputed. *See also, Affidavit of Sergeant St. Pierre,* **Exhibit N** *at ¶¶7-16 (taking pursuant to valid, identification problem did not arise until after permission granted; Christopher Celona could not state how many guns in his possession and could not identify Prudence's gun by sight); See Affidavit of Sergeant Trifiro,* **Exhibit L,** *at ¶¶12-14 (noting Prudence Celona opted to wait to retrieve her weapon due to unwillingness to wait for an evidence officer).*

35. Undisputed.

36. Undisputed. *See also, Affidavit of Sergeant St. Pierre,* **Exhibit N** *at ¶¶7-16 (taking pursuant to valid, identification problem did not arise until after permission granted; Christopher Celona could not state how many guns in his possession and could not identify Prudence's gun by sight).*

37. Undisputed. *See Affidavit of Sergeant Trifiro,* **Exhibit L,** *at ¶¶12-14 (noting Prudence Celona opted to wait to retrieve her weapon due to unwillingness to wait for an evidence officer).*

38. Disputed. Sergeant St. Pierre has averred that the alleged entry and taking were pursuant to unequivocal consent. *See Affidavit of Sergeant St. Pierre,* **Exhibit N** *¶¶7-16. See also Plaintiffs'* **Exhibit D** *at pg. 31: 3-8 ("I told him* **I would be glad to give him** *the . . . weapons"). See also, Plaintiff's* **Exhibit G** *(noting that Christopher's statement regarding the gun owned by Prudence did not occur until they were in the basement,*

*upon opening the locker, no reference to father's guns other than to state some of the guns were "heirlooms" of the family).*

39. Disputed that the narrative report makes a value assessment—each of the guns were assigned the same default monetary figure. *See Plaintiff's Exhibit H*.

40. Disputed. *See Affidavit of Sergeant Trifiro,* **Exhibit L,** *at ¶¶12-14 (noting Prudence Celona opted to wait to retrieve her weapon due to unwillingness to wait for an evidence officer).*

41. Disputed. *See Affidavit of Sergeant Trifiro,* **Exhibit L,** *at ¶¶12-14 (noting Prudence Celona opted to wait to retrieve her weapon due to unwillingness to wait for an evidence officer). On or about April 24, 2015, Prudence's and Paul's guns were released to them. See Copies of Signed Receipts,* **Exhibit O** *(receipts signed by Prudence for her gun and receipts sign by Paul for guns presumably his).*

42. Disputed. *See Affidavit of Sergeant Trifiro,* **Exhibit L,** *at ¶¶12-14 (noting Prudence Celona opted to wait to retrieve her weapon due to unwillingness to wait for an evidence officer). On or about April 24, 2015, Prudence's and Paul's guns were released to them. See Copies of Signed Receipts,* **Exhibit O** *(receipts signed by Prudence for her gun and receipts sign by Paul for guns presumably his). See also, Plaintiffs'* **Exhibit D,** *at pg. 48 (acknowledging transfer of Christopher's guns to Paul through the portal and stating "we got them all" in response to inquiry regarding retrieval status).*

43. Undisputed.

44. Disputed as immaterial for purposes of summary judgment. *See Jarvis* v. *Village Gun Shop, Inc.*, 805 F. 3d at 5, n. 1 ("[I]t is well-settled that such statutory notice is sufficient to put gun owners on notice of the possibility that their guns may be transferred.").

45. Undisputed.

46. Disputed. Christopher Celona has not identified the date of the alleged coyote attack other than to state it occurred after April 7, 2015. Prudence's gun was undisputedly returned to her on April 24, 2015. *See Exhibit O.* Plaintiff has testified that "we got them all back" on the same day. *See Plaintiffs'* **Exhibit D,** *at pg. 48,*

47. Undisputed.

48. Undisputed.

**DEFENDANTS' ADDITIONAL STATEMENTS OF MATERIAL FACTS**

49. Christopher Celona ("Christopher") first applied for his Class A- License to Carry ("LTC") with the Gardner Police Department on or about October 8, 2008. *See Copy of Christopher Celona's 2008 Class A- LTC Application, attached hereto as **Exhibit K**, marked as Exhibit 1 to Christopher Celona's Deposition.*

50. The 2008 application contained the following questions:
    7.. In any state or federal jurisdiction have you ever been convicted as an adult or adjudicated a youthful offender or delinquent child for the commission of . . . (e) a violation of any laws regulating the use, possession or sale of controlled substances as defined in Section 1 of MGL 94C?
    
    …
    
    10. Have you ever appeared in Court as a defendant for any criminal offense (excluding non-criminal traffic offenses)? *See **Exhibit K**.*

51. Christopher answered "no" to both questions. *See id.* Sometime in 2015, Christopher re-applied for his Class A LTC. *See Deposition Transcript of Christopher Celona, Plaintiffs' **Exhibit D**, at pgs. 22, 25.*

52. On his renewal application, Christopher represented that he had not previously been convicted for possession of controlled substances and that he had never appeared in Court for any criminal offense. *See Narrative of Sergeant James F. Trifiro, Ref.: 15-659-OF, Plaintiffs' **Exhibit B**; **Exhibit D**, at pgs. 24 - 25 (stating, "Probably, yeah" when asked at his deposition if he answered "no" on his renewal application to prior criminal record questions).*

53. The LTC application process involves a review by various administration agencies, including by the Firearms Records Bureau ("FRB"), and is completed online, through the Massachusetts Instant Record Check System. *See Affidavit of Sergeant James F. Trifiro, at ¶4, attached hereto as **Exhibit L**.*

54. On or about January 29, 2015, as part of the review process, the FRB flagged a 1991 drug conviction against Christopher in New Hampshire. *See **Exhibit L**, at ¶5, and attached MIRCS details.*

55. At the FRB's request, Sergeant Trifiro reviewed the charge and conviction information with both the Keene, New Hampshire and the Milford, New Hampshire Police Departments. *See **Exhibit L**, at ¶6; **Plaintiff's Exhibit B**.*

56. Based on his investigation, Sergeant Trifiro learned that Christopher was previously convicted of misdemeanor possession of a "318-B: 2"controlled substance, which, in New

Hampshire, refers to a schedule of substances ranging from heroin to marijuana. *See* ***Exhibit L,*** *at ¶7;* ***Plaintiff's Exhibit B.***

57. Sergeant Trifiro communicated his findings to the FRB and the FRB confirmed that the 1991 conviction was a statutory disqualifier. *See* ***Exhibit L,*** *at ¶8;* ***Plaintiff's Exhibit B.***

58. On or about April 6, 2015, Sergeant Trifiro informed Gardner Police Chief Neil Erickson ("Chief Erickson") of his findings. *See* ***Exhibit L,*** *at ¶9;* ***Plaintiff's Exhibit B***.

59. Based on this information, Chief Erickson directed Sergeant Trifiro to deny Christopher's application. *See* ***Exhibit L, at ¶9;*** ***Plaintiff's Exhibit B.***

60. At the time, neither Sergeant Trifiro nor Chief Erickson had knowledge as to the specific nature or amount of the controlled substance Christopher was previously convicted of possessing. *See* ***Exhibit L,*** at ***¶10;*** *Defendant Chief Erickson's Answers to Interrogatories, Answer No. 5, attached hereto as* ***Exhibit M.***

61. On April 6, 2015, Chief Erickson drafted a written notice of denial to Christopher, which notice informed him of the basis for the denial, the right to appeal the denial, and his obligation to "turn into the police department . . . without delay, your firearms . . . which you have in your possession." *See* ***Exhibit M,*** *Answer to No. 6; Plaintiffs'* ***Exhibit F***.

62. The April 6, 2015, letter informed Christopher Celona, in bold writing, that the failure to turn over his weapons constituted a criminal offense under the gun licensing statute. *See Plaintiffs'* ***Exhibit F***.

63. On or about April 7, 2015, Sergeant Russell St. Pierre ("Sergeant St. Pierre") traveled to 201 Otter River Road, Gardner, MA to deliver Chief Erickson's denial letter. *See Affidavit of Sergeant Russell St. Pierre, at ¶3, attached hereto as* ***Exhibit N.***

64. When he arrived at the residence, he was informed that Christopher was not at home and thus left a message for him to call the station. *See* ***Exhibit N,*** *at ¶4.*

65. Later that afternoon, Sergeant St. Pierre received notice via dispatch that Christopher had called and was at home. *See* ***Exhibit N,*** *at ¶5.*

66. At approximately 4:30 PM, Sergeant St. Pierre returned to 201 Otter River Road to deliver the notice. *See* ***Exhibit N,*** *at ¶6; Plaintiff's* ***Exhibit D,*** *at pg. 28.*

67. Sergeant St. Pierre and Christopher met in Christopher's driveway. *See* ***Exhibit N,*** *¶7.*

68. While speaking in the driveway, Sergeant St. Pierre gave Christopher the denial letter and informed him that he would need to turn over the guns in his possession. *See* ***Exhibit N,*** *¶7-8; Plaintiff's* ***Exhibit D,*** *at pgs. 28-29 (admitting written denial provided and that he "must have" read the denial notice).*

69. According to Sergeant St. Pierre, Christopher did not ask to see a warrant. *See **Exhibit** N, ¶9*.

70. Sergeant St. Pierre recalled that Christopher Celona agreed to turn over his guns. *See **Exhibit** N, ¶8; Plaintiffs' **Exhibit** G ("Celona was polite and compliant")*.

71. At his deposition, Christopher admitted that he agreed to turn them over. *See Plaintiffs' **Exhibit** D at pg. 31: 3-8 ("I told him **I would be glad to give him** the five weapons, but he's not to take any other ones because they didn't belong to me.")*.

72. Christopher testified that he did object, however, to turning over the guns owned by his wife and father. *See Plaintiffs' **Exhibit** D, at pg. 31: 3-8. But see, Plaintiff's **Exhibit** G (noting that Christopher's statement regarding the gun owned by Prudence did not occur until they were in the basement, upon opening the locker, no reference to father's guns other than to state some of the guns were "heirlooms" of the family)*.

73. According to Sergeant St. Pierre, Christopher walked him directly to the basement bulkhead, opened the door, and showed him the guns which were locked in safes. *See **Exhibit** N, at ¶10*.

74. Sergeant St. Pierre entered the basement with Christopher's permission and proceeded directly to the safes, which were visible from the doorway. *See **Exhibit** N, at ¶10*.

75. Christopher then opened the safes with his keys. *See **Exhibit** N, at ¶11*.

76. A total of twenty-seven guns were stored in the basement. *See Plaintiffs' **Exhibit** H (identifying twenty-seven guns, all marked as owned by Christopher Celona as of April 7, 2015)*.

77. Sergeant St. Pierre attests in his Affidavit that he asked Christopher if he was able to identify which of the twenty-seven guns belonged to his wife. *See **Exhibit** N, at ¶12*.

78. According to Sergeant St. Pierre, Christopher could not specifically identify it. *See **Exhibit** N, at ¶12; Plaintiff's **Exhibit** G ("While examining the guns, he was unable to say which guns belonged to [his wife].")*.

79. Indeed, he did not know how many guns were in the safes. *See Plaintiff's **Exhibit** G ("The firearms were counted twice as Celona did not know the total number of weapons that he had in his possession.")*.

80. Based on the number of un-identifiable guns in the lockers, Sergeant St. Pierre informed Christopher that all of the guns would need to be taken back to the station unless his wife could assist with the identification in person. *See **Exhibit** N, at ¶14*.

81. Christopher did not know when his wife would be home to assist. *See **Exhibit N**, at ¶14*.

82. Due to Christopher's inability to identify which of the twenty-seven guns were not his, all of the guns were taken back to the station for identification and safe-keeping. *See **Exhibit N**, ¶15. See also, Plaintiff's **Exhibit H**, (marking all guns as held for safe-keeping)*.

83. Sergeant St. Pierre has further attested that, had Christopher at any time objected to surrendering the guns or asked to see a warrant, he would have called for back-up, posted a watch, and sought a warrant as necessary. *See **Exhibit N**, at ¶16*.

84. A receipt was provided for the guns' retrieval. *See Plaintiffs' **Exhibit G** (noting receipt provided); Plaintiff's **Exhibit D**, at pg. 37: 20-22*.

85. Although Christopher claims he possessed (and consented to turn over) only five guns on April 7, 2015, *see Plaintiffs' **Exhibit D**, at pg. 31,* he also testified that his father was "letting [him] hold onto" his guns, which accounted for majority of the remaining guns in the safes. *See Plaintiff's Exhibit D, at pgs. 35-37 (admitting that father did not expect to get the guns back; stating that he was holding the guns despite fact that his father had a "legit" gun safe). See also, Plaintiffs' **Exhibit J**, at pg. 14 (noting "heirloom" guns were stored at 201 Otter River Road as a bequest to her son by Paul Celona)*.

86. On or about April 9, 2015, Christopher, his wife, Prudence Celona ("Prudence"), and Christopher's father, Paul Celona ("Paul"), met with Sergeant Trifiro in the lobby of the Gardner Police Department. *See **Exhibit L**, at ¶11*.

87. Five of the twenty-seven guns were identified at the time as owned by Christopher; the remainder was marked as in his possession. *See Plaintiffs' **Exhibit B**, at pg. 2*.

88. Sergeant Trifiro informed the Celonas of the process for transferring surrendered guns to a holder of a valid LTC via the Massachusetts Gun Transaction Portal on the FRB's webpage. *See id. See also, Plaintiffs' **Exhibit D**, at pg. 41: 6-18*.

89. During their meeting, Prudence informed Sergeant Trifiro that one of the guns, a Colt .45 Pistol, was hers and she asked to retrieve it. *See **Exhibit L**, at ¶12*.

90. According to Sergeant Trifiro, he offered her the option of waiting in the lobby until an evidence officer was available. *See **Exhibit L**, at ¶12*.

91. Sergeant Trifiro also offered Prudence Celona the option of retrieving her Pistol along with the remaining transferred guns all on one day. *See **Exhibit L**, at ¶13*. Prudence chose not to wait. *See **Exhibit L**, at ¶14*.

92. The next day, on April 10, 2015, two of the twenty-seven guns were identified as belonging to Paul, one was identified as belonging to Prudence, five were identified as belonging to Christopher, one belonged to an individual by the name of Alan Patz (a

former colleague of Christopher's), one belonged to Anthony Celona (Christopher's brother), and seventeen did not have any confirmed owner. *See Plaintiffs' **Exhibit B**, at pg. 2*; *Plaintiffs' **Exhibit D**, at pgs. 45-46 (stating that Alan Patz sold him the shotgun and that he was "holding" his brother's gun for him for "shooting" purposes).*

93. Sergeant Trifiro confirmed on two separate occasions with the FRB that that the proper procedure for transferring surrendered guns to a valid LTC holder is through the Massachusetts Gun Transaction Portal. *See **Exhibit L**, at ¶15*.

94. On or about April 24, 2015, Prudence's and Paul's guns were released to them. *See Copies of Signed Receipts, attached hereto as **Exhibit O**.*

95. After they transferred the remaining guns through the Portal to Paul Celona, all of the guns were released. *See Plaintiffs' **Exhibit D**, at pg. 48 (acknowledging transfer of Christopher's guns to Paul through the portal and stating "we got them all" in response to inquiry regarding retrieval status).*

96. Christopher Celona did not appeal the denial of his renewal application for his Class A LTC. ***Exhibit L**, at ¶16*.

97. On November 7, 2015, he re-filed a renewal application. *See Copy of Renewal Application, attached hereto as **Exhibit P**, marked as Exhibit 6 to Plaintiff Christopher Celona's Deposition*.

98. In December 2015, his renewal application was granted. *See Plaintiffs' **Exhibit D**, at pgs. 54: 20 – 55:3*.

                                        DEFENDANTS,
                                        By their attorneys,

                                        /s/ Gerard T. Donnelly
                                        Gerard T. Donnelly, Esquire
                                        BBO # 553283
                                        Courtney E. Mayo, Esquire
                                        BBO # 657790
                                        Margarita I. Warren, Esquire
                                        BBO # 683098
                                        Hassett & Donnelly, P.C.
                                        446 Main Street - 12th Floor
                                        Worcester, MA 01608
                                        Phone: (508) 791-6287
                                        gdonnelly@hassettanddonnelly.com
                                        cmayo@hassettanddonnelly.com
                                        mwarren@hassettanddonnelly.com

Dated: January 11, 2017

## CERTIFICATE OF SERVICE

      I, Gerard T. Donnelly, counsel for the defendants in the above-entitled matter, hereby certify that I have served a copy of the foregoing upon all parties through the Electronic Case Filing system this 11th day of January 2017 to:

J. Steven Foley, Esquire
Law Office of J. Steven Foley
100 Pleasant Street # 100
Worcester, MA 01609
JSteven@attorneyfoley.com

                                        /s/ Gerard T. Donnelly
                                        Gerard T. Donnelly, Esquire