# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER CELONA, PRUDENCE CELONA, and PAUL CELONA,<br>    Plaintiffs,<br><br>v.<br><br><br>NEIL ERICKSON, JAMES F. TRIFIRO, and RUSS ST. PIERRE,<br>    Defendants. | CIVIL ACTION<br>NO. 15-40147-TSH |

## ORDER AND MEMORANDUM OF DECISION
### September 19, 2017

**HILLMAN, D.J.**

### Background

Christopher Celona ("Christopher"), Prudence Celona ("Prudence") and Paul Celona ("Paul") have filed a federal civil rights claim against Neil Erickson, Chief of the Gardner Police Department ("Chief Erickson") and Gardner Policer Officers James Trifiro ("Sgt. Trifiro"), and Russ St. Pierre ("Sgt. St. Pierrre") under 42 U.S.C. §1983 for violation of their constitutional rights. Chief Erickson and Sgts. Trifiro and Pierre are being sued in their individual and official capacities. Specifically, Plaintiffs allege that the Defendants violated their Second Amendment Right to bear arms, their Fourth Amendment Right to be free from unreasonable seizure and/or their Fourteenth Amendment right to due process. Among the relief sought by the Plaintiffs is:

1. injunctive relief requiring Chief Erickson to immediately reissue a License to Carry Firearms to Christopher;

2. a declaratory judgment that the denial of Christopher's application for a Massachusetts License to Carry Firearms for a minor marijuana conviction violates his Second Amendment and Fourteenth Amendment right to bear arms;

3. an order permanently enjoining Defendants from denying, suspending or revoking a license to carry firearms due to a minor marijuana possession conviction;

4. a judgment for montary damages for Christopher and Prudence for damages due to loss of their livestock; and

5. a declaratory judgment that Chapter 140 §129D does not authorize police to enter homes to search for weapons and/or to seize property.

This Order addresses Plaintiff's [sic] Motion For Summary Judgment (Docket No. 16). For the reasons set forth below, that motion is denied.

## Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v.*

*Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or " improbable inferences". *Id.* (citation to quoted case omitted). " ' The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

## Facts

Christopher held a License to Carry ("LTC") a Firearm for approximately twenty (20) years. He first filed an application for a Class A LTC with the Gardner Police Department on October 8, 2008. That application included the following questions:

> 7. In any state or federal jurisdiction have you ever been convicted as an adult or adjudicated a youthful offender or delinquent child for the commission of . . . (e) a violation of any laws regulating the use,

3

>    possession or sale of controlled substances as defined in Section 1 of MGL 94C?
>
>    ….
>
>    10. Have you ever appeared in Court as a defendant for any criminal offense (excluding non-criminal traffic offenses).

Christopher answered "no" to both questions even though when he was 18, he as convicted of simple possession of less than an ounce of a controlled substance in New Hampshire. He also completed at least three (3) applications to renew his LTC. In addition to not disclosing his New Hampshire conviction on his original application, he did not disclose it on any one of his renewal applications. Christopher claims that he was unware or confused as to the meaning of the legal aspects of the statutory reference on the application (presumably referring to Mass.Gen.L. ch. 94C). However, he admits to misrepresenting on his applications that he had never appeared in Court as a criminal defendant.

In 2015, Celona tried to renew his LTC prior to its expiration date. The LTC application process involves a review by various administration agencies, including the Firearms Records Bureau ("FRB"), and is completed online through the Massachusetts Instant Record Check System. On or about January 29, 2015, as part of the review process, the FRB flagged a 1991 drug conviction against Christopher in New Hampshire. At the FRB's request, Sergeant Trifiro reviewed the charge and conviction information with both the Keene, New Hampshire and the Milford, New Hampshire Police Departments. On April 5, 2015, he discovered that in 1991, Christopher had been convicted of a misdemeanor for possession of a controlled substance and paid a $250.00 fine. Sgt. Trifiro communicated his findings to the FRB and the FRB confirmed that the 1991 conviction was a statutory disqualifier. On April 6, 2015, Sgt. Trifiro informed Chief Erickson of his findings. At the time, neither Sgt. Trifiro

nor Chief Erickson was aware of the nature or amount of controlled substance that Christopher had been convicted of possessing. That same day, Chief Erickson drafted a rejection letter to Christopher stating his LTC application was denied because of the conviction. In the letter, Chief Erickson informed Christopher of the basis of the denial, his right of appeal, his obligation to turn the firearms in his possession over to the police department, without delay, and that failure to turn over the weapons in his possession would constitute a criminal offense.

On April 7th, 2015, Sgt. St. Pierre met with Christopher in the driveway of his residence and presented him with the letter denying his application to renew his Class A LTC. Sgt. St. Pierre informed Christopher that he would have to turn over the weapons in his possession. Sgt. St. Pierre did not have a warrant to search Christopher's residence and maintains that Christopher gave his consent for him to enter the home. It is undisputed that he entered the residence directly into the basement through the basement bulkhead (Christopher's firearms were stored in safes in the basement which were visible from the open doorway). It is also undisputed that he entered the residence for the purpose of taking all firearms belonging to Christopher. Some of the weapons in the safes belonged to Prudence. Paul also owned one or more of the weapons at some point in time, but it is unclear whether he owned them at the time of these events (he may have gifted them to Christopher and Prudence as a bequest to his grandson). Both Prudence and Paul held LTCs.

Sgt. St. Pierre was carrying a list of five weapons that were in Christopher's name. Christopher agreed to give him the five weapons, but told Sgt. St. Pierre that he could not take any weapons that belonged to his wife or father. Christopher was unsure of the number of

5

firearms in the safes. He examined the guns prior to their removal, but was unable to identify which of them belonged to Prudence. He also stated that a majority of the guns were family heirlooms and therefore, had significant importance to him. Because of the number of unidentifiable guns, Sgt. St. Pierre told Christopher that he would need to take them all back to the station unless Prudence could assist with their identification. However, the only members of the Celona family present at this time were Christopher and four children. Sgt. St. Pierre advised Christopher that Prudence's firearms could be returned to her once they were transferred properly at the police station. A receipt was provided for the guns. Christopher was polite and compliant throughout Sgt. St. Pierre's interaction with him.

Detective William Crockett indicated in his report that "Under the direction of Sgt. Trifiro, [he] returned seventeen of twenty seven guns which had been confiscated." In his report, Sgt. Trifiro wrote that he had informed Christopher about the process for retrieving the firearms that were confiscated two nights earlier. He also indicated that Prudence had informed him that one of the firearms confiscated was registered to her. After reviewing the property sheet which Sgt. St. Pierre had filled out regarding Christopher's confiscated firearms, Sgt. Trifiro confirmed that one of the listed firearms, a Colt .45 Pistol./Serial #2760644 ("Colt 45") was registered to Prudence.

On April 9, 2015, Sgt. Trifiro met with the three Plaintiffs at the Gardner Police Station. Prudence and Paul requested the return of their firearms. Five of the twenty-seven guns were identified as owned by Christopher, the remainder were identified as being in his possession. At that time, Christopher said he wanted to transfer all his weapons to Prudence. Sgt. Trifiro did not return the Colt 45 to Prudence that day. According to him, he told

6

Prudence she could wait in the lobby until an evidence offer was available, or she could come back another day and retrieve them all at once. Prudence chose not to wait around to pick up the one gun that day.

On April 10, 2015, using the CJIS database, it was determined that the 27 firearms seized by Sgt. St. Pierre on April 7th were registered as follows: five were owned by Christopher; two were owned by Paul; one was owned by Prudence; one was owned by Alan Patz (a former colleague of Christopher's); one was owned by Anthony Celona (Christopher's brother); and seventeen were not registered or had no confirmed owner. The Defendants refused to release the 17 unregistered weapons until Christopher "surrendered" them on the state database system and transferred them to Paul, Prudence, and Anthony Celona per the Gardner Police understanding of FRB protocol. Prudence's and Paul's guns were returned to them on or about April 24, 2015. After the remaining guns were transferred to Paul using the Massachusetts Gun Transaction Portal, they were returned to him. All of these guns were physically transferred to Paul and he kept them at his residence.

Christopher did not appeal the denial of his Class A LTC renewal application. On November 3, 2015, Sgt. Trifiro discussed with Chief Erickson a letter from the FRB dated October 26, 2015, in which it was stated that under Massachusetts case law, a conviction for possession of marijuana of less than one ounce no longer disqualified a person from obtaining a firearms license. Thereafter, the Defendants contacted Christopher and invited him to reapply for his LTC; he did so and in December 2015, was granted a LTC. The firearms were then physically relocated from Paul's home to Christopher's and Prudence's residence.

Christopher and Prudence raise livestock. Sometime after the confiscation of their weapons on April 7, 2015, several of their chickens were killed or injured by a wild coyote. Christopher claims that he was unable to stop the attacks because he did not have his firearms.

## Discussion

### The Massachusetts Statute Relevant to Plaintiffs' Claims

Massachusetts law provides that that prohibits a person from obtaining a LTC where that person:

> (ii) has, in any other state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (A) a felony; (B) a misdemeanor punishable by imprisonment for more than 2 years; (C) a violent crime as defined in section 121; (D) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; (E) a violation of any law regulating the use, possession or sale of a controlled substance as defined in said section 1 of said chapter 94C including, but not limited to, a violation of said chapter 94C; or (F) a misdemeanor crime of domestic violence as defined in 18 U.S.C. 921(a)(33);
> ….

Mass. Gen. Laws Ann. ch. 140, § 131 (emphasis added).

### Whether the Court Has Jurisdiction Over Plaintiffs' Requests For Injunctive And/Or Declaratory Relief

Before addressing the merits of Plaintiffs' claims, I must first determine whether I have jurisdiction over them. Federal courts do not have jurisdiction to decide cases that have been rendered moot. For that reason, this Court must first determine whether any of the Plaintiffs' claims are moot as a result of the approval of Christopher's application to renew his LTC. "A case becomes moot when 'intervening events make it impossible to grant the prevailing party effective relief.'". *Pineiro v. Gemme*, 937 F. Supp. 2d 161, 170 (D. Mass. 2013)(citation to quoted case omitted).

Plaintiffs seek money damages suffered as a result of the alleged wrongful denial of Christopher's application for a LTC and the resultant confiscation of their firearms. Essentially, they allege that they are entitled to nominal damages and damages for "lost [livestock] because without their firearms (which had been wrongfully confiscated), they were unable to defend such livestock from predators. "[Such] claims have not been rendered moot, because [Plaintiffs] allege[] a deprivation of constitutional rights for which a remedy is still available under § 1983.'" *Id.* For that reason, I find that I have jurisdiction to decide Plaintiffs' claims for declaratory relief. Plaintiffs' claims for injunctive, however, stands on different footing and before proceeding any further with respect to such claims, the Court must determine whether Plaintiffs' request for injunctive relief has been mooted by: (1) the issuance of a firearms permit to Christopher and the return of all firearms to the Plaintiffs, and (2) the fact that the policy which led the Gardner police to reject Christopher's application for a firearm license and the confiscation of Plaintiffs' firearms is no longer being enforced. Related to the mootness question is the issue of whether Plaintiffs have standing to pursue their claims for injunctive relief. "The doctrine of standing is of both constitutional and prudential dimension. The necessity to establish constitutional standing is rooted in the case or controversy requirement of the Constitution. '[T]he standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf'". *Mangual v. Rotger-Sabat,* 317 F.3d 45, 56 (1st Cir. 2003).

> Standing is a threshold question in every case; '[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case.' To satisfy the case-or-controversy requirement of Article III of the United States Constitution, plaintiffs bear the

> burden of establishing that they (1) have suffered an 'injury-in-fact,' (2) that the injury is ' 'fairly traceable' to the actions of the defendant,' and (3) that the injury will likely be redressed by a favorable decision. These elements must be proved 'with the manner and degree of evidence required at the successive stages of the litigation.'
>
> An 'injury-in-fact' 'is defined as 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'

*Davis v. Grimes*, 9 F.Supp.3d 12, 22–23 (D.Mass. 2014). The party invoking the jurisdiction of the federal court bears the burden of establishing standing. *Mangual*, 317 F.3d at 56.

Christopher requests that the Court issue an order requiring Chief Erickson to immediately reissue him a LTC. At the hearing on the Plaintiffs' motion for summary judgment his counsel acknowledged that this request is moot. However, Counsel stated that he was still seeking to have the Court order that the Defendants be prohibited from enforcing Section 131(d)(ii)(E) to the extent it disqualifies a person from obtaining a LTC because of a prior "civil marijuana possession offense." In *Davis*, another judge in this Court stated that:

> It is well-settled that the denial of a firearms license constitutes an injury that satisfies the minimum requirements of Article III standing. Furthermore, a party whose cognizable interest has been injured by a firearms license restriction has standing to challenge that restriction.

*Id.*, at 23. However, the circumstances of the plaintiffs' in *Davis* are distinguishable from that of the Plaintiffs in this case. In *Davis*, the plaintiffs applied for unrestricted Class A firearms licenses, but were granted either Class A or Class B licenses *with restrictions*, which the court found to "constitute[] 'a concrete and particularized' injury sufficient to give them standing." *Id.* In this case, Christopher has been issued the LTC for which he applied *and* Chief Erickson and the City of Gardner have represented that based on their current understanding of

Massachusetts law, a person is no longer disqualified from obtaining a LTC based on a prior conviction for possession of marijuana of less than one ounce [1]

I find that Plaintiffs lack standing to request that the Court issue an order enjoining the Defendants from denying, suspending or revoking a LTC due to a misdemeanor conviction for possession of marijuana given that there is no actual or imminent likelihood that they, any other Gardner resident (or any other Massachusetts resident for that matter) face denial of an application for a LTC in the future as the result of a prior conviction for possession of marijuana of less than one once. Accordingly, Plaintiffs' claims for injunctive relief are denied.

### Plaintiffs' Claims For Violation Of Their Second Amendment Right To Bear Arms

#### *Whether Christopher's Second Amendment Rights were Violated*

Christopher asserts that Chief Erickson violated his Second and Fourteenth Amendment rights as a matter of law by refusing to grant him a LTC as the result of his prior misdemeanor conviction for possession of marijuana. Christopher asserts that Chief Erickson's refusal caused him actual damages because he was unable to protect his chickens from wild coyotes. Christopher cited *Wesson* and *Peraino* to support his assertion that Chief

---

[1] Two judges in this Court have issued decisions holding that it violates the Second Amendment to bar a person from purchasing and possessing a firearm(s) to be kept in his home for purposes of self-defense due to a prior misdemeanor conviction for possession of marijuana (whether that conviction was in Massachusetts or elsewhere). *See Richmond v. Peraino*, 128 F.Supp.3d 415 (.D.Mass. 2015); *Wesson v. Town of Salisbury*, 13 F.Supp.3d 171 (D.Mass. 2014). Moreover, the Commonwealth of Massachusetts intervened in the *Wesson* case and conceded that the plaintiffs in that case were entitled to a declaration that to the extent that Massachusetts law barred them from possessing firearms due to prior convictions for misdemeanor possession of marijuana, the law "infringe[d] on their Second Amendment right to possess firearms in the home for self-defense." *Wesson*, 131 F.Supp.3d at 178. The Commonwealth of Massachusetts declined to intervene in the *Peraino* case, but confirmed the position it had taken in the *Wesson* case. *See Peraino*, 128 F.Supp.3d at 418 n.3. At the hearing, Plaintiffs' counsel stated that based on these two decisions, the same day the instant case was filed, the Commonwealth of Massachusetts notified all the police chiefs in Massachusetts that the provision was no longer being enforced.

Erickson violated his Second Amendment right. In both of those cases, the court held that Mass.Gen. L. ch. 140, §131(d)(ii)(E)[2] and §131A, infringed on the plaintiffs' Second Amendment right to possess firearms in their homes, where the only reason for denying their applications for a LTC was their having previously been found guilty of possession of a small amount of marijuana (less than one ounce).

At the time that Christopher applied for his LTC:

> LTC applicants whose criminal record consists of a single violation, in Massachusetts, for possession of less than one ounce of marijuana [were] not generally disqualified from obtaining an LTC. This is so because, under Massachusetts law, a person convicted of possession of less than an ounce of marijuana, who has no prior convictions for a drug offense, 'shall be placed on probation ... [and] [u]pon successful completion of said probation, the case shall be dismissed and records shall be sealed.' Mass. Gen. Laws ch. 94C, § 34. Once sealed, the record of conviction, 'shall not be deemed a conviction for purposes of any disqualification or for any other purpose.' *Id.* Further, as part of the decriminalization of possession of small amounts of marijuana in 2008, Massachusetts law was amended to prevent the Commonwealth, 'any of its political subdivisions or their respective agencies, authorities or instrumentalities' from imposing 'any form of penalty, sanction or disqualification on an offender for possessing an ounce or less of marihuana.' Mass. Gen. Laws ch. 94C, § 32L.

*Peraino*, 128 F. Supp. at 419. However, Christopher has ignored one important fact which distinguishes his case from those of the plaintiffs in *Peraino* and *Wesson*: at the time that Chief Erickson denied Christopher's application for a LTC, he did not know the nature of the

---

[2] Mass.Gen.L. Ch. 140, §131 was amended after the *Wesson* case was decided. For purposes of the *Wesson* decision, the relevant statute was Mass.Gen.L. ch. 140, §131(d)(i)(e), which defined a prohibited person as one who had been convicted of specified controlled substance offenses in any state or federal jurisdiction. The statute was amended effective January 1, 2015 to make § 131(d)(i)(E) applicable only to persons convicted in *Massachusetts* court of violation of specified controlled substance offenses. At the same time, the statue was amended to add §131(d)(ii)(E), which provides that prohibits a person is one convicted in *any other* state or federal jurisdiction of specified controlled substance offenses. Thus, for purposes of this discussion, there is no substantive difference between the version of the statute in effect at the time of the *Wesson* case and the version in effect at the time of *Peraino* and the instant case.

illegal substance for which Christopher had been convicted in New Hampshire. On this record, I cannot find that Chief Erickson initial denial of Christopher's application for a LTC violated his constitutional rights.[3] Even if I were to find that Chief Erickson's denial of Christopher's application for an LTC violated his Second Amendment rights, Christopher's claim against Chief Erickson is barred because Chief Erickson is entitled to qualified immunity.

> 'Qualified immunity is a judge-made doctrine designed to "balance two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." ' The doctrine thus protects from liability for civil damages all public officials other than those who, 'from an objective standpoint, should have known that their conduct was unlawful.'
> The qualified immunity inquiry has two parts. A court must decide whether the plaintiff has made out a violation of a constitutional right and, if so, whether the right was clearly established at the time of the violation. This second part, in turn, has two aspects. The first focuses on the clarity of the law at the time of the violation. The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights. The "salient question" is whether the state of the law at the time of the violation gave the defendant fair warning that his particular conduct was unconstitutional.

*Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)(internal citations and citation to quoted case omitted). The issue of qualified immunity was raised in the Defendants' opposition to the motion for summary judgment. Plaintiffs did not file a reply brief, but counsel argued the issue at the hearing on the motion for summary judgment. Chief Erickson denied Christopher's

---

[3] On October 26, 2015, the Gardner Police Department was informed by the FRB that under Massachusetts case law, a conviction for possession of marijuana of less than one ounce no longer disqualified a person from obtaining a firearms license. The Defendants then contacted Christopher and invited him to reapply for his LTC; he did so and in December 2015, was granted a LTC. Whether Chief Erickson knew or should have known the true nature of Christopher's conviction at an earlier date is arguably not before me (the issue has either been briefed in summary fashion or not at all). Moreover, given that I find that Chief Erickson is entitled to qualified immunity, it is an issue which need not be resolved.

13

application only after being informed by Sgt. Trifiro that he had checked with the FRB and it was the FRB's position that Christopher's conviction disqualified him from obtaining a LTC. Additionally, the conviction was from the state of New Hampshire and it was not apparent from the four corners of the documents provided to Chief Erickson that the controlled substance at issue was (1) marijuana, and (2) less than an ounce. Even if I assume that Christopher's constitutional rights were violated, under the facts of this case, a reasonable defendant in Chief Erickson's position would not have understood that his conduct violated Christopher's constitutional rights. Therefore, summary judgment shall enter for Chief Erickson on Christopher's claim for violation of his Second Amendment rights.

Christopher has also sued Chief Erickson in his official capacity: a suit against an officer in his official capacity is treated as a suit against the municipality by which such officer is employed-- in this case, the City of Gardner. However, he does cite to any facts or provide any legal argument in support of a claim against the City of Gardner. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018 (1978)(municipality may not be held liable unless injury is result of municipal policy or custom; where plaintiff is alleging that City is liable based on decision made by final policy maker, plaintiff must allege that final policy maker acted with deliberate indifference). For that reason, to the extent that he is seeking summary judgment against the City on this claim, his motion is denied.[4]

---

[4] Plaintiffs have sued all of the Defendants in their official capacities. However, they have not asserted any facts or provided any legal argument regarding any claim against the City of Gardner. Therefore, to the extent the Plaintiffs seek summary judgment against the City of Gardner on any their claims, their motion for summary judgment is denied.

*Whether Prudence's and Paul's Second Amendment Rights were violated*

Prudence and Paul assert that their constitutional rights were violated when they were denied access to their firearms by the Gardner police despite the fact that they both had valid LTC's. More specifically, they seek a declaratory judgment that their Second Amendment rights were violated when the Gardner Police refused to give them access to their weapons until they were "transferred" because they could not be given to someone living in the same house as Christopher. There are numerous disputed issues of material fact regarding the circumstances under which the Gardner police held the firearms before returning them to Prudence and Paul and for that reason, I cannot find as a matter of law that the Gardner police violated their Second Amendment rights. Therefore, I am denying their motion for summary judgment as to this claim.

Plaintiffs' Claims For Violation Of Their Fourth Amendment Right To Be Free From Unreasonable Searches and Seizures

Plaintiffs assert that the their Fourth Amendment rights were violated when the Gardner Police entered the residence of Christopher and Prudence without a warrant, conducted a search during which they compelled Christopher to open the safe, and seized the twenty-seven firearms. Plaintiffs further contend that even if Christopher consented to the search and seizure of the firearms (as contended by the Defendants), he could not consent on behalf of Prudence and Paul.

The Fourth Amendment protects against unreasonable searches and seizures. Warrantless searches and seizures conducted inside a residence are "presumptively

unreasonable," and violate the Fourth Amendment unless an exception to the warrant requirement applies. *See Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943 (2006); *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.Ct. 1284 (2004). A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct (1973). A police officer who enters a residence without a warrant must demonstrate that an exception to the warrant requirement applied in order to establish that there was no constitutional violation. *See Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

Defendants assert that after Sgt. Pierre told Christopher that he would have to surrender his firearms, Christopher unequivocally consented to the officer's entry into the residence, led him to the safe and voluntarily (and unequivocally) agreed to surrender his firearms. Christopher couldn't identify which of the twenty-seven firearms were registered to him, and neither Prudence nor Paul was home to assist with the identification. Thus, Sgt. St. Pierre took all of the guns and brought them to the police station until the question of who owned which guns could be sorted out. It is clear from the parties' submissions and argument at the hearing that the parties dispute materials facts which go the ultimate issues of Plaintiffs' Fourth Amendment claims, *i.e.*, whether Christopher consented to Sgt. Pierre's entry into the house and voluntarily surrendered the firearms. Moreover, Christopher owned the residence, all of the guns were stored in a safe on his property, and there was no one at the residence who could identify who owned which guns. On the record before me, I cannot find

16

as a matter of law that he did not have the right to consent to the search on behalf of Paul and Prudence, or that his voluntary surrender of the guns violated their constitutional rights.[5]

Sgt. St. Pierre argues that he is entitled to qualified immunity on Plaintiffs' Fourth Amendment Claims. However, whether he is entitled to qualified immunity depends largely on disputed issues of fact which cannot be resolved pre-trial. For that reason, I decline at this time to address whether Sgt. Pierre is entitled to qualified immunity with respect to this claim.

Whether Plaintiffs' Are Entitled to Summary Judgment On Their Fourteenth Amendment Due Process Claims

Plaintiffs allege that their due process rights were violated because their firearms were seized without due process of law. However, Plaintiffs' barebones, conclusory argument in support of their claim, which does not include any comprehensive legal analysis, is insufficient to establish a violation of their constitutional rights. Moreover, as to Christopher's claim, it would appear that he had an adequate post-deprivation remedy, which he has not adequately addressed. *See Hightower v. City of Boston*, 693 F.3d 61 (D. Mass. 2012). Additionally, there are disputed facts regarding the surrendering of the firearms and their return such that this Court cannot decide the claim as a matter of law. There are also disputed issues of fact as to whether Christopher was advised of his right to appeal. Therefore, their motion for summary judgment on this claim is denied.

Sgt. Trifiro argues that he is entitled to qualified immunity with respect to this claim. However, whether he is entitled to qualified immunity depends largely on disputed issues of

---

[5] There also appears to be a question of fact whether Paul owned any of the twenty-seven guns at the time of these events as there is evidence on the record that suggests he had given them to Prudence and Christopher as a bequest their son (his grandson).

fact which cannot be resolved pre-trial. For that reason, I decline at this time to address whether Sgt. Trifiro is entitled to qualified immunity with respect to this claim.

For the reasons set forth above, the Plaintiffs' motion for summary judgment is denied. Summary Judgment shall enter for Chief Erickson on Christopher's claim for violation of his Second Amendment rights.

## **Conclusion**

It is hereby Ordered that:

Plaintiff's [sic] Motion For Summary Judgment (Docket No. 16) is ***denied***. Summary judgment shall enter for Chief Erickson on Christopher Celona's claim against him for violation of this Second Amendment rights.


/**s**/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**